DAVID L. ANDERSON (CABN 149604)
United States Attorney

BARBARA J. VALLIERE (DCBN 439353)
Chief, Criminal Division

BRIAN R. FAERSTEIN (CABN 274850)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, CA 94102-3495
    Telephone: 415-436-6473
    Fax: 415-436-7234
    Brian.Faerstein@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CR 18-00109 WHO |
| Plaintiff, | ) |
| | ) UNITED STATES' SENTENCING |
| v. | ) MEMORANDUM |
| | ) |
| ABRAHAM MENDEZ JIMENEZ, | ) Date: February 21, 2019 |
| | ) Time: 1:30 p.m. |
| Defendant. | ) |
| | ) Hon. William H. Orrick |

## I. INTRODUCTION

On July 12, 2018, defendant Abraham Mendez Jimenez (hereinafter "Jimenez" or "defendant") pleaded guilty to one count of distribution of and possession with intent to distribute five grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(viii). Defendant entered his guilty plea pursuant to a plea agreement under Rules 11(c)(1)(A) and 11(c)(1)(B) of the Federal Rules of Procedure. Sentencing is currently scheduled for February 21, 2019. The government submits the following sentencing memorandum to advise the Court of its Sentencing Guidelines calculation and its sentencing recommendation.

The government agrees with the United States Probation Office ("Probation") that the total

offense level is 23 and defendant's criminal history category is I, yielding an advisory Guidelines range of 46 months to 57 months in prison.  However, the government does not agree with Probation that a low-end Guidelines sentence is appropriate in this case.  For the reasons set forth below, the government recommends defendant be sentenced to a middle of the Guidelines sentence of 51 months' imprisonment with four years of supervised release that includes an enhanced special search condition, no fine, and the mandatory $100 special assessment.

## II.     DEFENDANT'S OFFENSE CONDUCT

As further described in the Presentence Investigation Report (the "PSR"), defendant's count of conviction arose out of his controlled sale of one pound of methamphetamine on November 2, 2017, to a confidential source (the "CS") working with the Department of Homeland Security, Homeland Security Investigations ("HSI").  Defendant discussed selling larger amounts of methamphetamine, up to 20 pounds, with the CS both before and after the November 2, 2017 transaction, but no other transactions came to fruition.

More specifically, the CS first met defendant, who was the owner of an auto body business in San Jose, at automobile auctions in the San Francisco Bay Area in 2017, and defendant informed the CS that he could broker a 20-pound methamphetamine transaction.  PSR at ¶¶ 7, 61.  According to the CS, defendant said that the individuals who could source the multiple-pound quantities of methamphetamine in the Bay Area obtained it from Mexico, after it had been smuggled into the United States and initially staged in the San Diego area.  *Id.* at ¶ 8.

In late August 2017, at the direction of and as surveilled by law enforcement, the CS contacted defendant to discuss a potential methamphetamine transaction, and they ultimately met in a Lowe's parking lot in San Jose, California on September 7, 2017.  *Id*. at ¶¶ 9-10.  During the meeting, defendant informed the CS that he knew individuals that regularly transported 40 pounds of methamphetamine to the Bay Area and sold the methamphetamine for $3,100 per pound.  *Id.* at ¶ 10.  Defendant also informed the CS that he could supply cocaine as well for the price of $32,000 per kilogram.  *Id*.

On November 2, 2017, defendant and the CS met once again to conduct a one-pound methamphetamine transaction in a Denny's parking lot in Redwood City, California.  *Id*. at ¶ 11.  During the meeting, which was surveilled by HSI and consensually recorded by the CS, defendant met with the

CS in a vehicle being driven by the CS and provided the CS with a brown paper bag containing a clear plastic zip-lock bag wrapped in black plastic. *Id*. at ¶¶ 11-12. The zip-lock bag consisted of approximately one pound of methamphetamine, which was approximately 460 grams of a mixture or substance containing a detectable amount of methamphetamine. Plea Agreement at ¶ 2. The CS provided defendant $3,100 for the approximate one pound of methamphetamine. PSR at ¶ 12. During the course of the transaction, defendant and the CS discussed potential additional larger methamphetamine transactions, either for 10 or 20 pounds. *Id*. at ¶ 13.

In the following days, defendant and the CS discussed the potential additional transaction further over the phone, and defendant informed the CS that it would cost $3,000 per pound for a transaction consisting of 20 pounds of methamphetamine. *Id*. at ¶¶ 14-15. Defendant and the CS scheduled the larger methamphetamine transaction to take place on November 16, 2017, but they first met at the Lowe's parking lot in San Jose on November 14, 2017, to discuss in person the planned transaction. *Id*. at ¶ 16. During that meeting, among other things, an HSI undercover agent (the "UC") showed defendant a bundle of U.S. currency to demonstrate to defendant that the CS and UC had sufficient money to purchase up to 20 pounds of methamphetamine. *Id*. at ¶ 18. At the end of the meeting, defendant informed the CS that he would speak with his source and try to make the deal happen. *Id*. However, at some point after this meeting, defendant "dropped" his phone number and the CS could no longer reach defendant to complete a second controlled methamphetamine transaction. *Id*. at ¶ 19.

### III. SENTENCING GUIDELINES CALCULATIONS

The government agrees with Probation that the Sentencing Guidelines calculation should be as follows under the Guidelines, in recognition that defendant appears to meet the criteria for the "safety valve" set forth in 18 U.S.C. § 3553(f):

    a. <u>Base Offense Level, U.S.S.G. § 2D1.1(a)(5), (c)(6)</u>:    28
       (between 350 and 500 grams of methamphetamine mixture)

    b. <u>Safety valve</u>:
       If Probation finds that I meet the requirements of
       U.S.S.G. § 5C1.2(a)(1)-(4) and the Government finds
       that I have truthfully debriefed with them within the
       meaning of 5C1.2(a)(1)(5).    -2

    c. <u>Acceptance of Responsibility</u>:
       If I meet the requirements of U.S.S.G. § 3E1.1 through
       sentencing, I may be entitled to a three-level reduction

|  |  |  |
|---|---|---|
|  | for acceptance of responsibility, provided that I forthrightly admit my guilt, cooperate with the Court and the Probation Office in any presentence investigation ordered by the Court, and continue to manifest an acceptance of responsibility through and including the time of sentencing. | -3 |
| d. | Total offense level: | 23 |

The government also concurs with Probation's calculation of defendant's criminal history score of CHC I. With a Criminal History Category of I, and a Total Offense Level of 23, defendant's advisory Guidelines range for a term of custody is 46 months to 57 months.

## IV.     SECTION 3553(a) FACTORS

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). Under 18 U.S.C. § 3553(a), in arriving at the appropriate sentence for the defendant, the Court should consider, among other factors, the nature and circumstances of the offense and the history and characteristics of the defendant, § 3553(a)(1); the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, § 3553(a)(2)(A); the need for the sentence imposed to afford adequate deterrence to criminal conduct, § 3553(a)(2)(B); the need for the sentence imposed to protect the public from further crimes of the defendant, § 3553(a)(2)(C); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6).

## V.     SENTENCING RECOMMENDATION

### A.     Term of Custody

The government believes a middle of the Guidelines sentence of 51 months in prison is sufficient, but not greater than necessary, to achieve the goals of sentencing under 18 U.S.C. § 3553(a). The government's recommendation is informed by the following considerations.

First, the government acknowledges that Probation is recommending a low-end Guidelines sentence of 46 months in prison, in large part based on the fact that "defendant has never served a custodial sentence and has a relatively minor criminal record in comparison to the scope and seriousness of the instant offense." PSR Sentencing Recommendation at pg. 2. The government does not dispute

the existence of these mitigating factors.  However, the government believes Probation's assessment, which also acknowledges defendant's "claim that he had access to multi-pound quantities" of methamphetamine, discounts the significance of this factor in the overall analysis.

From all accounts, defendant appears to have been a middleman, as opposed to an importing source, of methamphetamine.  However, defendant held himself out as being well-connected to individuals with access to large quantities of methamphetamine being smuggled in from Mexico, and appeared to have knowledge of how that methamphetamine was initially staged in San Diego for further distribution up to Northern California.  Defendant also showed himself capable of obtaining and selling one pound, or approximately 460 grams, of methamphetamine, providing further weight to his representations about his connections to large methamphetamine traffickers.  And defendant went so far as to conduct a "dry" meet in advance of the planned larger transaction, where the CS and the UC provided a "show" of the purported large amount of cash they had at their disposal to complete the 10- or 20-pound methamphetamine transaction.  In short, it appears defendant was more than capable of completing the larger methamphetamine transaction that never came to fruition, which is reflective of the overall seriousness of the nature and circumstances of his offense conduct.

Second, defendant obtained, possessed, and sold the CS approximately 460 grams of methamphetamine, which is more than nine times the 50-gram threshold Congress established for mandating a minimum sentence of 60 months in prison for the distribution of a mixture or substance of methamphetamine.  *See* 21 U.S.C. § 841(b)(1)(B)(viii).  The government recognizes that defendant appears to meet the criteria for the application of the "safety valve" under 18 U.S.C. § 3553(f), allowing the Court to impose a sentence without regard to the applicable 60-month mandatory minimum prison sentence in this case.  However, Congress's view as to the minimum appropriate sentence for a fraction of the quantity of methamphetamine at issue in this case is nonetheless instructive.  The government believes that a middle of the Guidelines sentence is warranted in recognition of the statutory framework.

Third, the government acknowledges that the advisory Guidelines range in this case is driven in large part by the methamphetamine (approximately 460 grams) defendant is responsible for distributing.  The PSR recognizes that while there is no identifiable victim in this case, "illicit drugs, including methamphetamine, are known to be dangerous and negatively impact the health and safety of

communities and society as a whole is a victim." PSR at ¶ 21. Such is particularly the case with respect to methamphetamine. "The consequences of methamphetamine abuse are terrible for the individual – psychologically, medically, and socially." Nat'l Inst. on Drug Abuse, "Methamphetamine Abuse and Addiction," Nat'l Inst. of Heath Pub. 13-4210 (rev. Sept. 2013) at 1.[1] Methamphetamine can cause memory loss, aggression, psychotic behavior, cardiovascular damage, malnutrition and severe dental problems from the dry mouth and bruxism that commonly accompany its use. *Id.* "Beyond its devastating effects on individual health, methamphetamine abuse threatens whole communities, causing new waves of crime, unemployment, child neglect or abuse, and other social ills," including increased transmission of infectious diseases, such as hepatitis and HIV/AIDS. *Id.* The distribution of methamphetamine carries serious potential consequences, whether intended or unintended, to the detriment of society, and such further underscores the seriousness of defendant's offense of conviction.

Finally, with regard to promoting respect for the law as well as general and specific deterrence, defendant's conduct in selling a significant quantity of methamphetamine to a relative stranger (*i.e.*, the CS he had just recently met) typifies conduct in the heartland of the offense conduct for which he is being sentenced. Reductions for his acceptance of responsibility and likely eligibility for the "safety valve" have been accounted for in his total offense level under the Guidelines, as has his lack of a significant criminal history in his CHC I. The government believes that, with respect to the resulting advisory Guidelines range, a middle of the Guidelines sentence is necessary to deter defendant and others similarly situated from engaging in the same serious criminal conduct for which defendant has been convicted.

For the reasons set forth above, the government believes a Guidelines custodial sentence of 51 months in prison is sufficient but not greater than necessary to achieve the goals of sentencing in this case.

### B. Supervised Release

The government agrees with Probation that defendant should be sentenced to a term of four years of supervised release to follow a term of custody.

---

[1] This report is available at https://www.drugabuse.gov/publications/research-reports/methamphetamine/letter-director, and the tabs associated with it (last visited February 14, 2019).

The inclusion of a term of supervised release provides a further measure of necessary deterrence and protection for the public against potential further crimes of defendant. Section 5D1.1(c) of the Guidelines provides that, "[t]he court ordinarily should not impose a term of supervised release in a case in which supervised release is not required by statute and the defendant is a deportable alien who likely will be deported after imprisonment." U.S.S.G. § 5D1.1(c) (2018). The government acknowledges that defendant will likely be deported following his term of imprisonment, and, assuming the "safety valve" applies, a term of supervised release would not be statutorily required in this case.[2] However, the commentary to Section 5D1.1 provides that, "[t]he court should, however, consider imposing a term of supervised release on [a] defendant if the court determines it would provide an added measure of deterrence and protection based on the facts and circumstances of a particular case." U.S.S.G. § 5D1.1 cmt. n.5 (2018). Here, a term of supervision is important in terms of general deterrence against illegal aliens with prior convictions returning to the United States and specific deterrence against this defendant from returning to the United States without prior authorization such that he would immediately be in violation of that term of supervised release (in addition to likely committing a violation of 18 U.S.C. § 1326). In addition, the government cannot predict with certainty whether defendant will be deported (immediately or otherwise) following his potential significant term of custody, and thus a term of supervised release would be critical for immediate structure and supervision following release from incarceration.

Should the Court find a term of supervised release is appropriate for purposes of deterrence or in the oft-chance defendant is not deported following his custodial term, the government notes that the parties agreed to an expanded search term in the plea agreement as part of supervised release. Probation also recommends this expanded search term in its proposed special conditions of supervised release.

**C.     Fine and Special Assessment**

The government concurs with Probation that defendant appears unable to pay a fine and that such fine should be waived. Defendant is subject to a mandatory special assessment of $100.

---

[2] If the Court finds defendant meets the criteria for application of the "safety valve" under 18 U.S.C. § 3553(f), the mandatory minimum term of supervised release (here, four years) would not apply. *See* U.S.S.G. § 5D1.2, cmt. n.2 (2018). Nonetheless, for the reasons set forth herein, the government believes the Court should impose a four-year term of supervised release.

## VI. CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court sentence Defendant Abraham Mendez Jimenez to a term of 51 months in prison, with 4 years' supervised release, no fine, and a $100 special assessment.

Dated: February 14, 2019

Respectfully submitted,

DAVID L. ANDERSON
United States Attorney

By: _____/s/_____
    BRIAN R. FAERSTEIN
    Assistant United States Attorney