STEVEN G. KALAR
Federal Public Defender
Northern District of California
GABRIELA BISCHOF
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone: (415) 436-7700
Facsimile: (415) 436-7706
Email: gabriela_bischof@fd.org

Counsel for Defendant MENDEZ

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ABRAHAM MENDEZ JIMENEZ,<br><br>Defendant. | **Case No.:** CR 18–00109 WHO<br><br>**DEFENDANT'S SENTENCING MEMORANDUM**<br><br>**Date:** February 21, 2019<br><br>**Time:** 1:30 p.m.<br><br>**Court:** Honorable William H. Orrick |

DEF'T SENT. MEMO

## INTRODUCTION

Mr. Mendez is a man who, as a result of his family's dire financial circumstances and his own addiction participated in criminal conduct that is wholly against his nature: for $100, he acted as a middleman in the sale of a pound of methamphetamine. He experienced deep remorse and withdrew from further conduct six months before his arrest. His arrest, the hardship his family has experienced as a result, and his impending deportation have deterred him even further. Mr. Mendez concedes that the applicable guideline range is 46 to 57 months. Nevertheless, a significant downward variance is warranted here as a result of many factors, including: (1) the aberrant nature of Mr. Mendez's criminal conduct and his fundamentally law-abiding history; (2) his close relationship with his children and the harsh effect of extended incarceration on innocent family members; and (3) his likely deportation and preclusion from participation in RDAP. Here, the factors set forth under 18 U.S.C. §3553(a)(2) cannot be better achieved by a longer custodial sentence; accordingly, a sentence of time-served (nearly ten months) is appropriate.

## BACKGROUND

On May 3, 2018, Mr. Mendez's family was terrified. They had no idea where he could be, and none of them even contemplated the possibility that the reliable, hardworking husband and father they knew could have been arrested for drug trafficking. Before his aberrant conduct and the resulting arrest permanently altered the course of his future, Abraham Mendez Jimenez was a simple man living a simple life. As his wife explains,[1] for a man accustomed to hardship, he was surprisingly naïve to the ways of the world: he transitioned from the law-abiding family of his youth directly into a steady adult life with his wife and children.

---

[1] See Declaration of Gabriela Bischof In Support of Sentencing Memorandum ("Bischof Decl."), Exhibit M, Sentencing Video. Because the Final Presentence Report was completed before undersigned counsel took over the case, and Mr. Mendez's personal history could not be verified because his wife's phone was shut off, the sentencing video provides the customary family member verification of the facts set forth in the PSR and further factual background about Mr. Mendez's life before, during, and after the offense.

DEF'T SENT. MEMO
*MENDEZ*, CR 18–00109 WHO

He was born into a poor but loving family in Mexico. Mr. Mendez is no stranger to hard work; by the time he was six, he would attend school until lunchtime and then work in the fields until sundown. Eventually, he came to the United States to better provide for his family in Mexico. He married his wife, Monique Carrasco, a United States citizen, in 2001, and became a devoted father to her two toddler sons, Ralph and Juan. The pair went on to have a daughter, Rosalia, together. They were always poor, but were able to survive on two incomes. Mr. Mendez worked consistently in auto shops until eventually started his own. Mr. Mendez was notoriously soft-hearted; homeless people would seek out the shop because they knew Mr. Mendez would offer them food. Their workdays were defined by the happy chaos of taking their three kids to school, weekends by watching children's sports games and practices, and by teaching the boys how to detail cars while Mr. Mendez worked long hours at the shop. His daughter Rosalia suffers from a learning disability, and he was always available to help with homework or remind her to study.

Then, on Christmas Day in 2015, Monique's car was hit by a gas tanker as she drove on the highway. The accident damaged her back, and left her in severe pain, unable to work. Mr. Mendez took on the full burden of caring for her and providing all income for the family. He took on extra hours and childcare responsibilities, and the children noticed no difference in their day to day lives. But the shop was not doing well, Monique's medical bills piled up, and the landlord raised their rent. It was during this time that Mr. Mendez was offered methamphetamine by a friend. He soon started using it regularly to boost his mood and work the even longer hours that were now required to support his family. Although he tried, he could not stop using methamphetamine on his own.

In the thick of his addiction, Mr. Mendez met the confidential informant (CI) through his work.[2] When the CI expressed interest in obtaining pounds of methamphetamine, Mr. Mendez thought mostly of the $100 he would make on the sale of a pound. It would be easy: he

---

[2] Mr. Mendez agrees with the Offense Conduct as set forth in the PSR, and provides these additional facts only for further context.

DEF'T SENT. MEMO
*MENDEZ*, CR 18–00109 WHO

2

would get the drugs from his dealer, who could trust him because he knew where Mr. Mendez lived and worked. Mr. Mendez's cut of the profit would be enough to cover his habit for a month, with even a little left over to pay for a few groceries. He made the sale.

After the sale, he led the confidential informant on for a few more weeks, promising large amounts of methamphetamine, never delivering, citing "trust issues" with his source. During this time, his wife knew something was wrong. When they attended church together, the normally stoic Mr. Mendez would weep openly. His morality and the criminal thinking of survival and addiction had finally collided in his consciousness, and he could not continue on. He changed his phone number and steadfastly avoided the confidential informant. He never completed a second transaction and was arrested six months later.

Mr. Mendez was remorseful before his arrest, but his remorse has only deepened as he has witnessed the impact his incarceration has had on his family. While he was in custody, his first grandchild was born prematurely. His grandson just recently stopped eating through a feeding tube, but they still have never had the opportunity to meet. His wife struggles through daily pain to provide income for the family. His son, daughter, and wife are on the brink of being evicted from their single room in the auto shop where they live. A deeply religious man, Mr. Mendez believes that his arrest is God's righteous punishment for his wrongdoing, and he has called all of his family members to apologize and make himself right with God.

Although Mr. Mendez's wife and daughter are both United States citizens, he never successfully obtained legal status. As a result of his conduct, he will lose his path to citizenship and be placed in deportation proceedings at the end of his term of custody. Though he will likely try to fight deportation, and remain detained indefinitely as a result, it is almost certain that he will be deported.

## DISCUSSION

After *Booker*, the United States Sentencing Guidelines are merely "advisory," and sentencing courts are required to consider all of the factors listed in 18 U.S.C. § 3553(a) in imposing a sentence. *United States v. Booker*, 125 S.Ct. 738, 757 (2005). The primary directive

in § 3553(a) is that the Court must impose a sentence that is "sufficient, but not greater than necessary, to comply with" the purposes of sentencing. See 18 U.S.C. § 3553(a) (emphasis added). As *Booker* emphasized, under the Sentencing Reform Act, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *Booker*, 125 S.Ct. at 760 (quoting 18 U.S.C. § 3661). Here the defense contends that a sentence of time served is sufficient, but not greater than necessary. What follows is a detailed discussion of the relevant § 3553(a) factors.

A. History And Characteristics Of Mr. Mendez

The eleven attached letters of support attest to Mr. Mendez's fundamentally honest and hardworking nature, and his endless devotion to his wife and children. Bischof Decl., Exs. A through K.

### 1. *Strong Family Support and Harsh Effect Of Incarceration On Innocent Family Members*

Before and after *Booker*, whether characterized as a guidelines departure or section 3553(a) variance, courts have long recognized that a defendant's family pays a high price when the court imposes a prison sentence. This common-sense approach to sentencing affirms the public interest in holding a defendant accountable for his conduct while acknowledging the correlative public interest in minimizing harm to family members who will be affected by his incarceration. *See generally*, Hagan & Dinovitzer, *Collateral Consequences of Imprisonment for Children, Communities and Prisoners*, 26 Crime & Justice 121 (1999).

Mindful of such collateral consequences, courts have not hesitated to impose non-guidelines sentences based on family circumstances. *E.g.*, *United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008) (where guidelines range was 41 to 51 months, imposition of sentence of probation affirmed in part due to close relationship of father and child); *United States v. Husein*, 478 F.3d 318 (6th Cir. 2007) (where guidelines range was 37 to 46 months, imposition of 270 days home confinement affirmed based on family circumstances); *United States v. Galante*, 111 F.3d 1029 (2nd Cir. 1997) (affirming 13-level departure in drug case

DEF'T SENT. MEMO
*MENDEZ*, CR 18–00109 WHO

4

from 46-57 months to 8 days where defendant showed he was a conscientious and caring father of two young sons who would have faced severe financial hardships).

Mr. Mendez was the center of his family, and strived to embody the archetypal patriarch: loving but stern, stoic and uncomplaining, shoulderer of every burden and provider for all. Despite the hardships of life after his wife became disabled, none of the children even noticed a change in circumstances because Mr. Mendez was so quick to take on the increased burden. He came to their sports games, and drove his daughter to school every day. Without his emotional support, his wife finds it difficult to face each day. Bischof Decl., Ex. A, Letter from Monique Carrasco. Without his financial support, his family, who already had to move into the auto shop because they could not afford to rent an apartment, now faces the ongoing threat of eviction.

### 2. *Deportation and Ineligibility for RDAP*

Although the Ninth Circuit has held that the threat of deportation is not a basis for a downward *departure*, no such limitation exists on a post-*Booker* downward variance. *United States v. Alvarez-Cardenas*, 902 F.2d 734, 737 (9th Cir.1990); *United States v. Menyweather*, 447 F.3d 625, 634 (9th Cir.2006) abrogation on other grounds recognized by *United States v. Munoz–Camarena*, 621 F.3d 967, 969 (9th Cir.2010) (*Booke*r gives district courts "the discretion to weigh a multitude of mitigating and aggravating factors ..."). Some circuits have explicitly stated that the defendant's deportability may be considered as a variance factor. *See, e.g., United States v. Thavaraja*, 740 F.3d 253 (2d Cir. 2014) (holding that "a district court may take into account the uncertainties presented by the prospect of removal proceedings and the impact deportation will have on the defendant and his family"); *United States v. Flores-Olague*, 717 F.3d 526 (7th Cir. 2013) (stating a "sentencing court is well within its prerogatives and responsibilities in discussing a defendant's status as a deportable alien"); *United States v. Petrus*, 588 F.3d 347 (6th Cir. 2009) (noting that "immigration status" could lead the court to either vary downward or upward, depending on the facts of the case, and stating "either approach is within the discretion of the sentencing court"); *United States v. Morales-Uribe*, 470

F.3d 1282 (8th Cir. 2006) (observing "the need to protect the public from a defendant may be reduced in a case where, upon immediate release from incarceration, the Government will deport the defendant"). Here, Mr. Mendez's impending exile from his wife, his brother and sister, his children, and grandchild, and the life he has built for the last twenty years is a collateral consequence of his conduct and conviction. Unlike a defendant without status who would have been deported regardless of a criminal conviction, Mr. Mendez could have achieved citizenship through his wife or, later, his daughter. That chance is now lost to him and he may be separated from them forever. Such a consequence far exceeds the punishment doled out to the average defendant, and should be taken into consideration when crafting his sentence.

Moreover, as a direct result of his ICE detainer, Mr. Mendez cannot take advantage of programming that reduces the time served for similarly situated individuals. Mr. Mendez would otherwise be eligible to complete RDAP, for example, and receive a year off of his sentence. But because he has an ICE detainer and will be deported, he is unable to complete the extended halfway-house stay and therefore cannot participate at all. See 28 C.F.R. § 550.55 (stating that ICE detainees are ineligible for early release); 28 C.F.R. § 550.53 (including among the admission criteria to be admitted to RDAP, an inmate must be able to complete community-based programming, i.e. halfway house). Indeed, he will be ineligible for any form of halfway house placement, even the normal six months to one year that any inmate with good time may be considered for. *See* Bureau of Prisons Policy Statement PS 7310.04 (Community Corrections Center Utilization and Transfer Procedures) at 10 (Dec. 16, 1998) (indicating that community corrections placements are not ordinarily appropriate for inmates with a "Deportable Alien" Public Safety Factor). Thus, an equally culpable defendant without an ICE detainer would serve one year less than Mr. Mendez. A variance is therefore appropriate to ensure similar treatment of similarly situated individuals. Cf. 18 U.S.C. § 3553(a)(6) (listing as a consideration: "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct").

B.  <u>Nature and Circumstances of the Offense</u>

Mr. Mendez is before the Court because he became involved in methamphetamine trafficking as a result of his own addiction and his family's dire financial circumstances. Mr. Mendez is not a drug dealer by trade or inclination, and if either of those two factors had not been present, he never would have acted unlawfully. The weight involved means that the guidelines are quite high despite the fact that Mr. Mendez's criminal history is minimal. Certainly, the weight is an aggravating factor and Mr. Mendez understands the seriousness of his offense. Mr. Mendez indicated a willingness to accept responsibility early on, and manifested extraordinary acceptance of responsibility. He entered a guilty plea without seeking release, without filing any pretrial motions, and without challenging any aspect of the case against him. His early acceptance of responsibility saved time and resources for the government and the Court. His sentence should account for these facts.

C.  <u>A Sentence Of Time-Served Satisfies The Purposes Of Punishment Set Forth In § 3553(a)(2)</u>

A significant sentence of incarceration followed by four years of supervised release or, more likely, deportation, is sufficient to reflect the seriousness of the crime, deter future misconduct and to protect the public. Although Mr. Mendez suffered a DUI many years ago, and more recently, a driving on a suspended license conviction, he has never been incarcerated for any significant amount of time. His experience in this case – being arrested, held in jail, appearing in court, knowing that members of his family and community are aware of his offense, and preparing to be separated from his family indefinitely – has not been something he takes lightly at all. Mr. Mendez has been thoroughly punished and deterred.

Moreover, making an example of Mr. Mendez would not cause any sort of decline in the drug trafficking trade. Mr. Mendez was not a manufacturer or supplier of methamphetamine. There are an infinite number of desperate men, unaware of the consequences, ready to act as middlemen in drug transactions. "Empirical studies have shown that longer sentences have minimal or no benefit on whether offenders or potential offenders commit crimes. The National Academy of Sciences (NAS) concluded that 'insufficient

1  evidence exists to justify predicating policy choices on the general assumption that harsher
2  punishments yield measurable deterrent effects.' NAS pointed out that all leading surveys of
3  the deterrence research have reached the same conclusion: that 'potential offenders may not
4  accurately perceive, and may vastly underestimate, those risks and punishments' associated
5  with committing a crime." Brennan Center for Justice, What Caused the Crime Decline? 26
6  (Feb. 2015), *available at* https://www.brennancenter.org/publication/what-caused-crime-
7  decline. A longer sentence would have neither an incremental deterrent effect or advance any
8  interest in protecting the public.

## CONCLUSION

Mr. Mendez will pay a heavy price for his involvement in methamphetamine trafficking. Mr. Mendez was a law abiding man who made uncharacteristic decisions in response to difficult life circumstances that arose after his wife's accident. Now, he has been incarcerated for nearly ten months, watching helplessly as his family struggles to survive financially. Once he is released from custody, he will be incarcerated during deportation proceedings and eventually removed to Mexico. Under these particular circumstances, a sentence of time-served is sufficient and not greater than necessary to accomplish the goals of sentencing.

Respectfully submitted,

February 14, 2019                STEVEN G. KALAR
Dated                            Federal Public Defender
                                 Northern District of California

                                        /S
                                 GABRIELA BISCHOF
                                 Assistant Federal Public Defender

DEF'T SENT. MEMO
*MENDEZ*, CR 18–00109 WHO

8